UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEMETRIUS COOPER,

Plaintiff,

v. Case No. 25-CV-983

DR. KERRY KUFFENKAM et al.,

Defendants.

---

**DECISION AND ORDER**

---

Plaintiff Demetrius Cooper is incarcerated at Stanley Correctional Institution and representing himself in this 42 U.S.C. § 1983 case. He is proceeding on claims in connection with the care he received following gallbladder surgery while housed at Waupun Correctional Institution. (*See* ECF No. 22.) This matter comes before the Court on the parties' motions for summary judgment.

**PRELIMINARY MATTERS**

Cooper filed a motion to strike the declaration of Nurse Shelli Bauersfeld, Attorney Hailey A. Scasny, Dr. Karen Reynolds, and Attorney Franckowiak as well as these defendants' proposed findings of fact and exhibits. He asserts that the defendants' summary judgment materials do not comply with the district's local rules because they do not include specific references to the supporting materials. Cooper also filed a motion to strike Nurse Bauersfeld's response to his supplemental proposed findings of fact. He argues that, when Nurse Bauersfeld disputed his proposed findings of fact, she did not support her dispute by citing to affidavits, declarations, parts of the record, or other supporting materials. The defendants did, however, cite admissible evidence

to support their submissions in this case. In short, the defendants' filings substantially comply with the district's local rules.

Cooper also asserts that the defendants' documents are not properly authenticated. Yet, the Court can consider unauthenticated documents on motions for summary judgment if it appears they are capable of authentication at trial. *See Boyce v. Wexford Health Sources, Inc.*, No. 15-C-7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017) ("federal courts routinely consider unauthenticated documents on motions for summary judgment, for example, when it is apparent[] that such documents are capable of reduction to admissible, authenticated form" (internal quotation marks and citation omitted)). In this case, the documents the defendants rely upon are capable of being reduced to admissible, authenticated form. Accordingly, Cooper's motions to strike will be denied. The Court will now proceed to the merits of the motions for summary judgment.

**BACKGROUND**

Cooper, at all times in 2023, was a convicted prisoner in the custody of the Wisconsin Department of Corrections (DOC) and the Wisconsin Prison System. (ECF No. 247, ¶ 4.) On June 26, 2023, Advanced Practice Nurse Practitioner (APNP) Tonya Wesner referred Cooper to see Dr. Karen Reynolds. (*Id.* ¶ 7.) Dr. Reynolds was licensed to practice medicine as a general surgeon in the State of Wisconsin, employed by the Fond du Lac Regional Clinic, and board certified by the American Board of General Surgery. (*Id.* ¶ 5.)

Dr. Reynolds' initial consultation with Cooper occurred on August 9, 2023, at her office at the Fond du Lac Regional Clinic. (*Id.* ¶ 10.) Cooper sought evaluation and treatment for gallstones. (*Id.* ¶ 11.) Dr. Reynolds examined Cooper and determined that his physical symptoms and reported clinical history were consistent with symptomatic gallbladder disease. (*Id.* ¶ 14.) Dr. Reynolds discussed two treatment options with Cooper: conservative treatment or a surgical

procedure to remove the gallbladder called laparoscopic cholecystectomy. (*Id.* ¶¶ 16, 37.) Dr. Reynolds explained the details of the laparoscopic cholecystectomy procedure, as well as the benefits and its risks. (*Id.* ¶ 18.) Cooper indicated a desire to move forward with an elective laparoscopic cholecystectomy procedure, which was scheduled for September 26, 2023. (*Id.* ¶¶ 20, 25.)

During a laparoscopic cholecystectomy, a thin tube that contains a light and a camera, called a laparoscope, is placed into the patient's abdomen through a small incision. The laparoscope sends live video from the inside of the body to an outside monitor, allowing the surgeon to see and perform the surgery. Surgical tools are inserted through other small abdominal incisions. (*Id.* ¶ 38.) After the surgical tools and laparoscope are inserted, a gas is sent into the abdomen to inflate it, which has the effect of lifting the abdominal wall away from the internal organs, thereby providing the surgeon with a clear view of the gallbladder through the laparoscope. (*Id.* ¶ 39.) During the procedure, small clips made of titanium or medical grade plastic are placed to close off the bile duct and blood vessels. (*Id.* ¶ 41.) Once the surgical clips are in place, the gallbladder is surgically detached from the liver. The surgical clips remain in place and are not removed during the procedure. (*Id.* ¶ 42.) The gallbladder is placed in a bag, in order to prevent leaks. Then both the empty gallbladder and its contents are lifted through one of the small surgical incisions and removed from the body. (*Id.* ¶ 43.) Following the removal of the gallbladder, bile flows directly from the liver into the small intestine. (*Id.* ¶ 44.)

As with any surgical procedure, a laparoscopic cholecystectomy presents certain recognized risks, including a bile leak. (*Id.* ¶ 45.) If a bile leak occurs, it typically manifests itself symptomatically between a day and a week following the surgery. (*Id.* ¶ 49.)

Cooper's laparoscopic cholecystectomy procedure commenced at 10:18 a.m. on September 23, 2023. (*Id.* ¶ 52.) Following the removal of the gallbladder, intraoperatively, Dr. Reynolds inspected Cooper's abdomen utilizing the laparoscope. (*Id.* ¶ 55.) As part of her inspection, Dr. Reynolds confirmed that there was no bleeding or injury to any internal organs following the removal of the gallbladder. Dr. Reynolds also confirmed that the surgical clips were tight. There was no evidence of a bile leak.[1] (*Id.* ¶ 56.) After confirming there were no concerns with the appearance of Cooper's abdomen internally, Dr. Reynolds sutured the surgical incision and placed sterile dressings over the surgical cite. (*Id.* ¶ 57.) The procedure concluded at 10:55 a.m. (*Id.* ¶ 52.)

According to Dr. Reynolds, Cooper was never conscious in the operating room and did not verbally communicate to her that he was experiencing any degree of pain following the surgery. (*Id.* ¶ 59.) Even though the medical record notes that the anesthesia stopped at 11:01 a.m. and

---

[1] Cooper asserts that Dr. Reynolds admitted she identified an error in performing the surgery when she wrote in a report that she noticed a cut or ulceration measuring 0.2 centimeters on Cooper's gallbladder. He maintains that, when Dr. Reynolds noticed the cut to his gallbladder, she should have inspected his bile duct to determine if it was cut. To support his assertion, Cooper cites to a pathology report. This pathology report was *not* written by Dr. Reynolds, however. It was authored by Pathologist Shannon Rathke, M.D., at 1:56 p.m., over two hours after the surgery was completed. In describing Cooper's gallbladder, Dr. Rathke wrote:

> Specimen A is labeled gallbladder and is received in formalin. It consists of an intact gallbladder with a possible surgical cut or ulceration measuring 0.2 cm. The gallbladder measures 10.3 cm in length and 1.8 cm in maximum diameter. The serosa is smooth glistening green-blue color with no other perforations or adhesions identified. The gallbladder is opened the rest of the way to reveal a dark green bile with four large yellow stones measuring from 1.2 up to 1.4 cm in greatest dimension. The mucosa is a smooth, velvety dark brown. There are no polyps or ulcers identified. The mucosal wall has an average thickness of 0.2 cm. Representative sections from the cystic duct and the gallbladder wall are submitted in cassette A1.

(ECF No. 258-1 at 47.) Dr. Rathke's postoperative examination of Cooper's removed gallbladder does not support his assertion that Dr. Reynolds knew there was a small cut to Cooper's gallbladder upon its removal or that there was evidence of a bile leak during the surgery.

Cooper was transferred from the operating room to the Post-Anesthesia Care Unit (PACU) at 11:02 a.m., (ECF No. 235-3), Cooper asserts that he was conscious in the operating room after the procedure and told Dr. Reynolds that he experienced severe pain (ECF No. 237, ¶ 38). Cooper contends that he was balled into the fetal position, rolled in bed and clenched his stomach, sweated profusely, gagged, dry heaved, yelled in agony, and begged Dr. Reynolds for help. (*Id.* ¶¶ 39–40.) He asserts that Dr. Reynolds stated, "it could possibly be a bile leak, but he'll be okay, just take him to the recovery room." (*Id.* ¶ 42.) Dr. Reynolds disputes that she made this statement. (*Id.*)

As with any surgical procedure, pain in the immediate postoperative period is expected. Dr. Reynolds and the Certified Registered Nurse Anesthetist (CRNA), who provided the anesthesia for the procedure, issued orders for specified pain medications that could be administered by the nursing staff to Cooper in the event he reported any episodes of pain. (ECF No. 247, ¶ 67.)

While in the PACU, Cooper was monitored by PACU nursing staff. Dr. Reynolds was not directly involved in monitoring Cooper. (*Id.* ¶ 64.) PACU nursing staff had the authority to administer ordered pain medications to Cooper in response to reports of postoperative pain. (*Id.* ¶ 68.) PACU nursing staff administered three single doses of prescribed postoperative pain medications to Cooper: a single dose of Dilaudid was administered at 11:21 a.m., a single dose of Fentanyl (25 mcg) was administered at 11:30 a.m., and a single dose of Fentanyl (25 mcg) was administered at 11:43 a.m. (*Id.* ¶ 69.) If the PACU nurses who were monitoring Cooper had observed pain that was beyond the degree of normal and expected pain during the immediate postoperative period or that the pain could not be controlled through the administration of ordered postoperative pain medications, they were instructed to contact Dr. Reynolds and note it in Cooper's medical file. (*Id.* ¶¶ 70–71.) At no time while Cooper was in the PACU did nursing

staff notify Dr. Reynolds that Cooper complained of pain that was of an unusual nature or that could not be adequately addressed through the administration of the ordered pain medications.[2] (*Id.* ¶ 76.) Later that afternoon, Cooper was discharged from the PACU to Waupun Memorial Hospital's DOC-dedicated floor unit after PACU nursing staff determined that Cooper met the criteria for discharge to the floor. (*Id.* ¶ 77.)

While on the DOC unit, nursing staff monitored Cooper's recovery post-surgery. (*Id.* ¶ 78.) The nurses in the DOC unit were empowered to administer the pain medications that had been ordered to Cooper to assist with his expected postoperative pain. (*Id.* ¶ 80.) The nursing staff administered a single dose of hydrocodone-acetaminophen (Norco) at 12:45 p.m., shortly after Cooper was transferred from the PACU. (*Id.* ¶ 81.) The floor nurses were instructed to notify Dr. Reynolds in the event Cooper complained of pain beyond that which was to be expected in the immediate postoperative period or that could not be adequately addressed through the administration of the ordered postoperative pain medications. (*Id.* ¶ 82.) The nurses in the DOC unit did not contact Dr. Reynolds with any report that Cooper complained of pain that was out of the ordinary or that the pain could not adequately be addressed through the administration of the ordered postoperative pain medication. (*Id.* ¶ 85.)

---

[2] Cooper asserts that two unidentified nurses told Dr. Reynolds that he was in extreme pain, the Fentanyl was not helping, he could be experiencing a bile leak, and he should be reexamined. These statements are inadmissible hearsay and cannot be relied upon to avoid summary judgment. *See MMG Financial Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011).

Cooper also cites to his medical record flowchart to support his assertion that nursing staff notified Dr. Reynolds at 11:36 a.m. that he was suffering from severe pain and exhibiting signs of a bile leak. However, at 11:36 a.m., the nurse notified the physician that Cooper was being assessed for nausea and vomiting and requested an antiemetic to relieve nausea and vomiting symptoms. There is no note in this medical record indicating that the nurse notified Dr. Reynolds that Cooper was suffering from severe pain or exhibiting signs of a bile leak. (ECF No. 258-1 at 72.)

Dr. Reynolds does not typically see postoperative patients on the DOC unit prior to discharge. (*Id.* ¶ 86.) Dr. Reynolds did not see or speak with Cooper on the DOC floor unit. (*Id.* ¶ 88.) By the afternoon of September 26, 2023, nursing staff determined that Cooper met the criteria for discharge that day. (*Id.* ¶ 90.) Dr. Reynolds consequently issued a "transfer order," ordering the discharge of Cooper from the hospital back to Waupun Correctional Institution. (*Id.* ¶ 91.) Dr. Reynolds possessed no information at the time of Cooper's discharge to suggest that the laparoscopic cholecystectomy procedure had not been completed entirely without complication that day. (*Id.* ¶ 94.) Cooper did not exhibit any clinical signs consistent with a bile leak at the time of discharge. (*Id.* ¶ 95.)

After the surgery, Dr. Reynolds entered an order directed to Cooper's DOC caregivers and instructing them to call her if any questions or concerns with Cooper arose following his hospital discharge. They were also instructed to call Dr. Reynolds if certain clinical signs or symptoms were noted in Cooper following his discharge, including if Cooper had a temperature higher than 101.5 Fahrenheit; he is unable to urinate for six to eight hours after surgery or he becomes uncomfortable; his pain gets worse or does not get better after taking his prescribed pain medications as directed; he has nausea, vomiting, or loss of appetite; there is bleeding from Cooper's incision or IV site; or his incision or IV site looks infected. (*Id.* ¶¶ 89, 92.) Cooper was discharged from Waupun Memorial Hospital at 2:19 p.m. on September 26, 2023, with an order for 12 tablets of hydrocodone-acetaminophen (Norco). The medication was prescribed to help Cooper address any normal residual postoperative pain. (*Id.* ¶¶ 93, 96.) Cooper was never referred by the DOC to see Dr. Reynolds after the September 26, 2023, surgery. (*Id.* ¶ 100.)

On September 26, 2023, a nurse at Waupun Correctional Institution received a nurse report from Waupun Memorial Hospital reporting that Cooper had surgery and that four sites were glued

and steri-striped. The nursing narrative note states that Cooper had minimal pain tolerance; received Tylenol and Vicodin at 1:00 p.m.; and was eating, drinking, and moving around. Waupun Memorial Hospital asked to have Cooper follow up in three weeks. (ECF No. 256, ¶ 11.) Later that day, a nurse provider in the Health Services Unit (HSU) entered an order referring Cooper to nursing, which is typical post-surgery care. (*Id.* ¶ 12.) The HSU typically follows offsite recommendations, which in Cooper's case on September 26, 2023, was to remove the band-aid from the surgical site. Nursing would also have been looking for signs or symptoms of infection and talking with Cooper about how things were going post-surgery. (*Id.* ¶ 14.)

During the September 26, 2023, offsite return visit, nursing staff measured Cooper's vital signs. Cooper's vitals were within normal limits. (*Id.* ¶ 16.) On September 26, 2023, providers ordered Cooper two medications: Docusate, a stool softener, and Tramadol, a pain medication. (*Id.* ¶ 15.) Cooper did not take his prescribed anti-constipation medication, Docusate, on September 26 and September 27, 2023. (*Id.* ¶ 17.)

On September 28, 2023, security staff contacted HSU staff to report that Cooper was complaining of gas pains and difficulty breathing as a result of the pain. Cooper met with Nurse Jodi Van Stippen (who is not a defendant) for a follow up. According to Cooper, he told Nurse Van Stippen that he was in extreme pain since leaving the hospital and that he experienced nausea, shortness of breath, jaundice, and BBQ sauce–colored urine. (ECF No. 274, ¶¶ 37–38.) Nurse Van Stippen responded, "These are clear signs of postsurgical complications of a bile leak and I have to immediately contact a doctor because you need to be seen immediately." (*Id.* ¶ 39.) Nurse Van Stippen walked to the officer's desk, picked up the phone, and contacted, who Nurse Van Stippen referred to as, Dr. Kerry Kuffenkam. (*Id.* ¶ 40.)

Dr. Kuffenkam was not Cooper's primary care provider at Waupun Correctional Institution. Instead, APNP Wesner was Cooper's primary care provider. (ECF No. 256, ¶ 19.) Dr. Kuffenkam was covering for APNP Wesner in APNP Wesner's absence. (*Id.*)

According to Cooper, during the telephone conversation, Nurse Van Stippen told Dr. Kuffenkam, "I'm here with Mr. Cooper in the North Cell Hall, a patient that just returned from having a gallbladder surgery, and Cooper is experiencing clear and obvious signs of post-surgical complications that appear to be a bile leak. Cooper is experiencing extreme pain that has lasted since surgery, he's nauseous, he has shortness of breath, he's extremely jaundice, and has BBQ sauce–colored urine." (ECF No. 274, ¶ 41.) Nurse Van Stippen then stated, "He needs to be seen now and taken back to the hospital or emergency room." (*Id.* ¶ 42.) After Nurse Van Stippen ended the call, she returned to Cooper's cell and said, "I'm so sorry for what I can clearly see you're experiencing but Dr. Kuffenkam is refusing to see you and refusing to send you back to the hospital and there's nothing I can do, my hands are tied. I'm so sorry as I tried to express the importance of your situation but she's still refusing. My hands are tied." (*Id.*)

Nurse Van Stippen submitted a declaration disputing that Cooper reported post-surgical complications that included shortness of breath, jaundice, and urine color issues. (ECF No. 275, ¶ 16.) She maintains that, if he had reported such symptoms, she would have had him seen by a physician or would have had him transported off-site for evaluation. (*Id.*) Defendants also dispute that Nurse Van Stippen called Dr. Kuffenkam from the officer's desk or reported these symptoms. (ECF No. 274, ¶ 41.)

Sometime after Nurse Van Stippen left Cooper's cell area on September 28, 2023, she approached Dr. Kuffenkam in Dr. Kuffenkam's office. Nurse Van Stippen told Dr. Kuffenkam that Cooper had undergone surgery to remove his gallbladder on September 26, 2023; that he was

prescribed Tramadol 100 mg to take as needed four times a day for pain from September 26 to September 28 for a total of three days; that he was prescribed Docusate, a stool softener; and that he was taking the maximum dose of his opioids but was refusing to take Docusate, his constipation medication.[3] (ECF No. 256, ¶ 20.) Dr. Kuffenkam did not meet Cooper and did not know Cooper had gallbladder surgery on September 26, 2023, until Nurse Van Stippen told her about the surgery on September 28, 2023. (*Id.* ¶ 19.) Dr. Kuffenkam reviewed Cooper's medical records, which confirmed Nurse Van Stippen's report. (*Id.* ¶ 20.) Nurse Van Stippen's nursing note indicated that Cooper reported to her that he had not had a bowel movement, was not able to pass gas, and had a decreased appetite. She noted that Cooper's vitals were normal, he was not vomiting, he was up walking around the cell, and he allowed her to remove his steri-strips. (*Id.* ¶ 21.)

Dr. Kuffenkam believed that Cooper's symptoms were likely due to the reported abdominal bloating and constipation from his opioid medicine. (*Id.* ¶ 23.) Post-surgical pain after cholecystectomy is not uncommon. (*Id.* ¶ 24.) Cooper was on Tramadol, an opioid used to treat moderate to moderate-severe pain, after his cholecystectomy from September 26 through September 28. (*Id.* ¶ 25.) One common side effect of Tramadol, an opioid medication, is constipation. (*Id.* ¶¶ 27–28.) Because constipation while on an opioid medication is common, it is not considered a post-surgical complication. (*Id.* ¶ 28.) It is recommended that anti-constipation medication be taken along with opioid medication. (*Id.* ¶ 27.) Therefore, on September 26, 2023, Cooper was prescribed Docusate to take to prevent constipation. Yet, Cooper was not taking the anti-constipation medicine. (*Id.* ¶ 26.)

---

[3] Cooper disputes that this conversation occurred, but he does not have personal knowledge of what occurred after Nurse Van Stippen left his cell area.

Dr. Kuffenkam noted that Cooper was still having a lot of pain post-surgery. Due to Cooper's reported decreased ability to have a bowel movement or pass gas and his reported abdomen distention, abdominal bloating, and decreased appetite, Dr. Kuffenkam prescribed him three different medications: Maalox, an oral medication for constipation; Docusate-Senna tablets for constipation; and Simethicone tablets to help with the bloating. (*Id.* ¶¶ 29–30.) Even though APNP Wesner had already ordered Cooper to take Docusate tablets, Cooper was not taking them. As a result, Dr. Kuffenkam made the Docusate tablets staff controlled to confirm that Cooper was getting the medicine from the correctional officers and that he was taking the medicine. (*Id.* ¶ 31.) Dr. Kuffenkam also placed an order for Cooper to follow up with nursing staff to repeat his vitals and a physical exam in 48 hours, to ensure that Cooper was still at his medical baseline. (*Id.* ¶ 33.) The September 28, 2023, orders for anti-constipation and anti-gas medication were Dr. Kuffenkam's only interaction with Cooper's post-surgical medical issue. (*Id.* ¶ 37.)

According to Cooper, on September 28, 2023, Sergeant Barkhurst came to his cell and realized Cooper was nauseous, had shortness of breath, was extremely jaundice, and had BBQ sauce–colored urine. Sergeant Barkhurst contacted HSU and notified them that Cooper needed immediate medical attention. Cooper contends that unidentified nursing staff came to Cooper's cell but refused to provide treatment. (ECF No. 274, ¶¶ 48–50.)

On September 29, 2023, security staff reported to HSU that Cooper was complaining of gas pains and that he was refusing to take his medications or otherwise follow the plan of care at that time. Nursing staff encouraged Cooper to follow the plan of care and take the ordered medications to address his complaints. Nursing staff also instructed Cooper to contact HSU if his complaints continued after taking the prescribed medications and following the plan of care. (ECF No. 256, ¶ 38.)

Nurse Erin Wenger saw Cooper for the first time post-surgery on September 29, 2023. Nurse Wenger was employed by the Wisconsin Department of Corrections' Bureau of Health Services as a Nurse Clinician 2 at Waupun Correctional Institution from April 8, 2024, to February 4, 2026. (*Id.* ¶ 2.) According to Nurse Wenger, Cooper was ambulating without difficulty. At this visit, Cooper reported feeling dizzy and that he was "going to pass out," symptoms which were related to his ongoing stomach complaints. Nurse Wenger checked his vitals, which were stable and within normal limits. (*Id.* ¶ 39.) Because Cooper's vitals were stable and a plan of care had been established by Dr. Kuffenkam the prior day, Nurse Wenger did not contact a provider. (*Id.* ¶ 40.)

According to Cooper, during the September 29, 2023, visit, he was "extremely jaundiced," in extreme pain, and walked with a slow, slumped gait while guarding his stomach. (ECF No. 274, ¶ 51.) He told Nurse Wenger that he had not been able to eat, was nauseated and vomiting, had been in extreme pain for days, and urinated black urine. (*Id.*) Nurse Wenger asked Cooper to provide a urine sample. Cooper provided a urine sample and Nurse Wenger stated, "Wow! Your urine is tar black. Unfortunately, I won't be contacting a doctor, you'll be fine." (*Id.* ¶ 52.) Cooper responded, "I'm not fine, I'm in extreme pain experiencing nausea, shortness of breath, jaundice, and BBQ sauce–colored urine." Nurse Wenger told Cooper she would not contact a doctor because she thought Cooper was faking and, even if he was not faking, she would not contact a doctor because she did not care if Cooper died. (*Id.* ¶ 53.)

On October 1, 2023, Cooper filed a Health Services Request (HSR) stating that he had black urine, constipation, pain, and trapped gas. (ECF No. 256, ¶ 41.) HSU placed a referral to nursing in response to the HSR. (*Id.*) A nurse saw Cooper on October 2, 2023. Cooper reported stomach pain, black urine, constipation, gas, and bloating. According to Defendants, Cooper

reported to the nurse that he had not taken his prescribed medication because he took them once and they did not work. He also reported that the "black urine" had resolved, and he declined to take a urine sample. The nurse educated Plaintiff on the importance of taking his medication and reviewed the purpose of the medications with him. (*Id.* ¶ 42.) Cooper disputes that he reported that the black urine had resolved. (*Id.*) Cooper submitted another HSR reporting nausea and vomiting since "Lap chole." (*Id.* ¶ 43.) HSU placed a referral to nursing in response to the HSR. (*Id.*)

Nurse Wenger met with Cooper for a second time on October 5, 2023. According to Nurse Wenger, Cooper ambulated to and from his cell independently, without issues, and did not appear to be in any distress. He reported experiencing nausea and vomiting, as well as abdominal discomfort and pain. Cooper also reported having bowel movements and was passing gas. Cooper stated that the color of his stool and urine were brown. (*Id.* ¶ 44.) Cooper did not mention anything about losing weight to Nurse Wenger.[4] (*Id.* ¶ 52.) Nurse Wenger's examination findings were unremarkable. Her assessment showed that Cooper's vitals were stable, his abdomen was soft/tender, and bowel sounds were present. (*Id.* ¶ 44.) Nurse Wenger gave Cooper Tylenol for his subjective reports of pain. (*Id.* ¶ 48.)

According to Cooper, he explained to Nurse Wenger that he was in extreme pain, unable to eat, nauseous, urinating black urine, vomiting, and jaundiced. (ECF No. 274, ¶ 59.) Nurse Wenger told Cooper to stop contacting HSU and that she was not going to contact a doctor or provide him Tylenol. He maintains that she left the room without evaluating him. (*Id.* ¶ 60.)

---

[4] Cooper asserts that, at the appointment, he appeared "obviously much, much smaller in weight," but he does not indicate that he told Nurse Wenger that he lost weight. (ECF No. 258, ¶ 97.)

Nurse Wenger contends that she spoke to Cooper's primary care provider, APNP Wesner, in person about Cooper's symptoms. (ECF No. 256, ¶ 49.) Cooper's provider did not request that a provider visit be scheduled. (*Id.* ¶ 51.) After her discussion with APNP Wesner, Nurse Wenger sent Cooper a letter on October 5, 2023, summarizing his provider's recommendations:

> This is a follow up letter from your nursing appointment this morning (10/5/2023). Please take your prescribed, as needed, medications. You are ordered a gas medication (Simethicone) and a stool softener (Docusate). They will improve your abdominal pain and nausea. We have also sent some Tylenol to help with your discomfort.
>
> Please keep drinking water and walking as much as possible to encourage digestion and promote regular bowel movements. Your provider has been updated as well.

(*Id.* ¶ 50.) Cooper disputes that he received this letter from Nurse Wenger. (*Id.*) On October 5, 2023, a provider ordered Cooper acetaminophen four times per day for three days. The medication was to be used as needed, but Cooper had to get the medication from staff, which ensured that there would be a record of whether Cooper was taking the medication. (*Id.* ¶ 55.) All of Cooper's medications were staff controlled at all times. He would have been offered the medication four times a day. (*Id.* ¶ 56.)

On October 9, 2023, Nurse Wenger met with Cooper for a third time. According to Nurse Wenger, Cooper reported "very dark urine." She noted Cooper ambulated without difficulty and showed no signs of acute medical distress. Nurse Wenger notified Cooper of the copay policy, and he said he did not want to pay. He immediately changed his medical complaint to abdominal pain. He stated that his last bowel movement occurred two days prior, but he did not report complaints of nausea or vomiting. (*Id.* ¶ 58.) Cooper showed no signs of having jaundice. (*Id.* ¶ 67.) Nurse Wenger noted that, according to Cooper's medication administration reports, Cooper had been compliant with his stomach medication. (*Id.* ¶ 58.) She encouraged Cooper to continue to use his prescribed gas medications and stool softeners, drink water, and if needed, order Tylenol

from canteen as he had been instructed at prior appointments. (*Id.* ¶ 60.) When Nurse Wenger told Cooper that he could order Tylenol from the canteen, he did not tell her that he had a staff-controlled medication restriction, so he could not purchase medication from canteen. (*Id.* ¶ 61.) Cooper agreed to continue with the established plan of care. (*Id.* ¶ 60.)

According to Cooper, he again told Nurse Wenger that he was in extreme pain, unable to eat, nauseous, urinating black urine, vomiting, and jaundiced. (ECF No. 274, ¶ 61.) Nurse Wenger stated, "Yea, yea, yea, I know you're in extreme pain, again requesting Tylenol, unable to eat, nauseous, still urinating black urine, vomiting, jaundiced, and want to see a doctor. Bla, bla, bla, I've already told you it's not happening but now you're going to pay us a copay each time you contact us. This will obviously send the message that we don't want to see you. I don't care what you're experiencing, I'm not contacting a doctor." (*Id.* ¶ 62.) Then Nurse Wenger stormed out of the room and left the cell hall. (*Id.*)

Cooper did not contact HSU between October 10 and October 15, 2023. (ECF No. 256, ¶ 68.) Cooper met with his primary care provider, APNP Wesner, on October 16, 2023. (*Id.* ¶ 73.) He was sent to Waupun Memorial Hospital due to abnormal assessment findings. (*Id.*) Cooper was admitted to St. Agnes Hospital on October 16, 2023. (ECF No. 271, ¶ 34.) He remained at St. Agnes Hospital until October 23, 2023. (*Id.* ¶ 36.)

On October 23, 2023, Dr. Syed Zafar was the on-call hepatobiliary surgeon at the UW Health University Hospital and received a request to transfer Cooper from St. Agnes Hospital to the UW Health University Hospital, due to a persistent bile leak. (ECF No. 249, ¶ 8.) Dr. Zafar agreed that Cooper could transfer to UW Health University Hospital's general care unit. Cooper was in stable condition upon transfer. (*Id.* ¶ 9.) When a patient is admitted into UW Health University Hospital, one team is assigned to be the central point of contact. The coordinating team

ensures a single, cohesive plan for the patient. (*Id.* ¶ 10.) Because Dr. Zafar was the admitting physician, his surgical oncology team acted as the coordinating team. Members of the team communicated with multiple specialties to create a unified plan for Cooper. (*Id.* ¶ 11.)

Cooper arrived to UW Health University Hospital with an interventional radiology (IR) drain that served to drain bile from the liver. (*Id.* ¶ 18.) On October 24, 2023, UW Health providers (not Dr. Zafar) took images of Cooper's bile duct area using a special type of MRI called a magnetic resonance cholangiopancreatography that showed a bile leak. (*Id.* ¶ 13.) The gastrointestinal team performed an endoscopic retrograde cholangiopancreatography (ERCP) on October 25, 2023, and found that the prior stent had migrated and that there was a persistent leak. (*Id.* ¶¶ 14–15.) The gastrointestinal team replaced the stent to cover the leakage area. (*Id.* ¶ 16.) Dr. Zafar was not involved in performing the ERCP or placing a stent. (*Id.* ¶ 17.) That same day, Cooper complained to Dr. Michael Hannaman of intermittent abdominal pain and cramping. (ECF No. 271, ¶ 45.)

Dr. Zafar acknowledges that on October 23, 2023, Cooper arrived at UW Health University Hospital with a high persistent bile leak. (ECF No. 258-1 at 997.) Between October 24, 2023, and October 26, 2023, Cooper's drain output dropped from 100 milliliters of bile output to less than 30 milliliters. According to Dr. Zafar, 30 milliliters of bile output per day is considered "minimal output." (ECF No. 249, ¶ 19.) On October 27, 2023, Cooper received an ultrasound, which showed minimal fluid collection in the gallbladder fossa. (*Id.* ¶ 20.) Minimal fluid collection is not clinically significant. The body is capable of absorbing small, residual amounts of fluid once the main source of accumulation has been addressed by the drain. (*Id.* ¶ 21.)

Cooper's IR drain was no longer necessary when he had minimal bile output. An IR drain should be removed as soon as it fulfills its purpose. (*Id.* ¶ 22.) Leaving a drain unnecessarily can

lead to more issues, such as abscess or infection. (*Id.* ¶ 23.) After consulting gastroenterology and radiology, Dr. Zafar ordered that Cooper's IR drain be removed. The IR drain was removed on October 27, 2023. (*Id.* ¶ 24.)

Cooper asserts that Dr. Zafar removed Cooper's IR drain and closed the surgical site. (*Id.* ¶¶ 25–26.) According to Cooper, Dr. Zafar informed Cooper that he would be removing the IR drain, even though Cooper continued to have a collection of bile in his gallbladder fossa that could potentially cause an abscess. (ECF No. 271, ¶ 51.) Cooper then begged Dr. Zafar not to remove the IR drain given the amount of fluid that continued to collect and that, if he prematurely removed it, bile would accumulate and cause Cooper extreme pain again. (*Id.* ¶ 52.) Dr. Zafar told Cooper he no longer wanted to deal with his medical condition. He acknowledged that premature removal of an IR drain could cause a painful abscess on the liver that could later be fixed. (*Id.* ¶ 53.) Dr. Zafar told Cooper that he needed to discharge Cooper as soon as possible as Cooper's operations and medical procedures were causing the State of Wisconsin and taxpayers too much money. (*Id.* ¶ 54.)

Dr. Zafar disputes that this interaction occurred, that he removed Cooper's IR drain, or that he closed any incision (because there was no incision to close). (ECF No. 272, ¶¶ 25–26.) He cites to medical records indicating that a doctor with the initials "SM" removed the IR drain. (ECF No. 217-1 at 35–36.) On October 27, 2023, Cooper was discharged from UW Health University Hospital. (ECF No. 249, ¶ 27.) Dr. Zafar co-signed the discharge paperwork as the coordinating physician and central point of contact. (*Id.* ¶ 28.) Cooper asserts that he was discharging fluid when he was returned to Waupun Correctional Institution. (ECF No. 271, ¶ 55.)

While at Waupun Correctional Institution, Cooper experienced severe pain. (*Id.* ¶ 56.) On November 14, 2023, Cooper was admitted to Waupun Memorial Hospital and then transported to

UW Health University Hospital. (ECF No. 249, ¶ 30.) Gastroenterology and interventional radiology were consulted on Cooper's care. (*Id.* ¶ 32.) Dr. Zafar was not involved in Cooper's care during this hospital stay. (*Id.* ¶ 33.) On November 15, 2023, Cooper underwent another MRCP for a possible abscess and fluid collection. (*Id.* ¶ 34.) The MRCP showed that Cooper had developed a new abscess in his liver. (*Id.* ¶ 35.) On November 16, 2023, interventional radiology performed a percutaneous abscess drainage and placed an IR guided drain. (*Id.* ¶ 37.) On November 17, 2023, Cooper was discharged from UW Health University Hospital. (*Id.* ¶ 38.)

Upon discharge from UW Health University Hospital, HSU nursing staff were tasked with performing and documenting all aspects of Cooper's wound care. This included changing the dressing, cleaning the surrounding skin, flushing the tubing, and collecting the drainage. (ECF No. 253, ¶ 16.) Nursing staff also performed daily drain flushes with 10 milliliters of normal saline. (*Id.* ¶ 13.) To flush a drain with saline, a nurse gently pushes saline into the drainage tube to clear out blockages, clots, or thick fluid and prevent build up. (*Id.* ¶ 15.)

As part of Cooper's care, Nurse Shelli Bauersfeld, a board-certified registered nurse who worked at Waupun Correctional Institution from November 2023 to February 2024, performed routine drain maintenance and cleaning on multiple occasions, including November 17, 2023, November 24, 2023, and December 1, 2023. (ECF No. 253, ¶¶ 1–2, 17.)

Cooper reported pain when nurses flushed his drain. On December 7, 2023, Nurse Hiland noted that UW Health University Hospital's Interventional Radiology department had not returned a call to HSU nursing staff with instructions regarding flushing. Dr. Sara English advised that the flush could be held for that day while waiting for further recommendations from UW Interventional Radiology. (*Id.* ¶ 18.) Later that day, Nurse Hiland documented that she received a return call from a nurse with UW Interventional Radiology who recommended to stop daily

flushing. (*Id.* ¶ 19.) On December 7, 2023, Dr. English subsequently placed an order to discontinue daily flushing. (*Id.* ¶¶ 20–21.)

Cooper was escorted to HSU on December 26, 2023, to meet with Nurse Bauersfeld for a routine post-procedure treatment. (*Id.* ¶ 23.) According to Nurse Bauersfeld, she started the appointment by assessing Cooper's vital signs and then emptied the drain, changed the dressing, and documented the odor, appearance, and amount of drainage. (*Id.* ¶ 24.) In particular, Nurse Bauersfeld noted that the drain contained 7.5 cubic centimeters of very foul smelling dark red fluid with a thick strand of mucus, that a thick collection of brown/tan colored substance surrounded the insertion site, and that the area was red. (*Id.* ¶ 25.) Nurse Bauersfeld attempted to flush the drain. Cooper indicated he had increased pain for seconds, so she stopped the procedure. Cooper received only 0.5 cubic centimeters of normal saline, with 9.5 cubic centimeters left in the flush. (*Id.* ¶ 26.) After the signs of pain and distress were minimized, Cooper was cleared to return back to his cell. (*Id.* ¶ 27.) Nurse Bauersfeld notified a provider about the incident. (*Id.* ¶ 26.)

According to Cooper, when Nurse Bauersfeld began flushing Cooper's drain with saline, he immediately informed her that, on December 7, 2023, Dr. English placed an order in the medical chart to discontinue flushing his drain. (ECF No. 280, ¶ 61.) He begged Nurse Bauersfeld not to flush his drain because it caused extreme, unrelenting pain and asked her to review his medical chart to confirm that the flushing order had stopped. (*Id.* ¶ 62.) Nurse Bauersfeld told Cooper that she was the only medical professional in the room and did not need his advice. (*Id.* ¶ 64.) She then opened the valve to the drain and pushed the entire tube of saline into the drain. Cooper began screaming at the top of his lungs in pain. He dropped to the floor and curled into a fetal position. (*Id.* ¶ 65.) While Cooper was laying on the floor, Nurse Bauersfeld looked at Cooper's medical chart and stated, "Oh you were correct, the order had been placed to stop flushing your drain. Oh

well, it is what it is, now get out." (*Id.* ¶ 66.) Nurse Bauersfeld refused to treat Cooper's pain and ordered Cooper to be forcibly removed from the exam room. (*Id.* ¶ 68.) Cooper contends that Nurse Bauersfeld placed a false notation in Cooper's medical chart, claiming that she only pushed 0.5 cubic centimeters into the drain. (*Id.* ¶ 67.) Cooper's drainage catheter was removed at UW Health University Hospital on December 28, 2023. (ECF No. 253, ¶ 28.)

**LEGAL STANDARD**

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). The Court does not "weigh the evidence and determine the truth of the matter" but rather "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The fact that the parties filed cross-motions for summary judgment does not alter this standard. The movant has the burden to show that summary judgment is appropriate. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The Court will "read the facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 945 (7th Cir. 2024) (citation omitted). Nonetheless, the non-movant must go beyond mere allegations and conclusions and instead support its contentions with proper documentary evidence. *Foster v. PNC Bank*, 52 F.4th 315, 320 (7th Cir. 2022); *Weaver*, 3 F.4th at 934. Speculation is insufficient to create a genuine dispute of material fact. *Id.* If the movant sustains its burden and shows both that there are no disputed material facts and that it is entitled to judgment as a matter of law, "[t]he court shall grant summary judgment . . . ." Fed. R. Civ. P. 56(a).

## ANALYSIS

### A. Emergency Medical Treatment and Active Labor Act Claim

Cooper asserts that Waupun Memorial Hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA) when he was discharged from the hospital before his medical condition was stabilized. "EMTALA prohibits hospitals from inappropriately transferring or refusing to provide medical care to persons with emergency medical conditions." *Muzaffar v. Aurora Health Care Southern Lakes, Inc.*, 985 F. Supp. 2d 875, 877 (E.D. Wis. 2013) (citing 42 U.S.C. § 1395dd(a)–(c)). The statute was enacted to prevent "patient dumping," the practice of hospital emergency rooms refusing to provide treatment to uninsured individuals or transferring them to other facilities before their emergency conditions are stabilized. *Beller v. Health & Hosp. Corp. of Marion Cty., Indiana*, 703 F.3d 388, 390 (7th Cir. 2012) (citations omitted). EMTALA imposes "two duties on hospitals with respect to patients who come to their emergency rooms." *Id.* First, "if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination . . . ." 42 U.S.C. § 1395dd(a). If the hospital determines that the individual has an emergency medical condition, the hospital must then provide either stabilizing treatment or an appropriate transfer to another medical facility. 42 U.S.C. § 1395dd(b).

Waupun Memorial Hospital argues that Cooper's EMTALA claim fails because Cooper did not come to the hospital through the emergency department. The Court agrees that, under a plain reading of the statutory language, Cooper did not "come to" Waupun Memorial Hospital's "emergency department." Instead, Cooper presented to Waupun Memorial Hospital for a prescheduled and planned surgical procedure. He was admitted to the hospital for that procedure.

In short, EMTALA does not apply under the facts of this case, and Cooper's EMTALA claim against Waupun Memorial Hospital must be dismissed. *See Johnson v. Univ. of Chi. Hosps.*, 982 F.2d 230, 233 (7th Cir. 1992).

**B. Eighth Amendment Claims**

Cooper asserts that the individual defendants violated the Eighth Amendment. "[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotation marks omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment. It asks (1) "whether a plaintiff suffered from an objectively serious medical condition" and (2) whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)). Defendants do not dispute that Cooper suffered from an objectively serious medical condition. Therefore, the Court will focus its analysis on whether the individual defendants were deliberately to Cooper's condition.

An official is deliberately indifferent if that official was aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "Something more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409. Courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Id.* A "[d]isagreement between a prisoner and his doctor or even between two

medical professionals about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* "[T]he Eighth Amendment does not entitle prisoners to choose their course of treatment." *Harris v. Molinero*, 803 F. App'x 1, 5 (7th Cir. 2020).

**1. Dr. Reynolds**

Cooper argues that Dr. Reynolds negligently performed the laparoscopic cholecystectomy procedure, resulting in an immediate bile leak. He asserts that from the time his surgery concluded through his discharge from the hospital, Dr. Reynolds was deliberately indifferent to his extreme pain caused by the active bile leak. Cooper contends that, immediately after the surgery, he knew something had gone "wrong" in surgery because he experienced severe pain in his abdominal area that was "clearly not normal." (ECF No. 248, ¶ 38.) He presents no evidence or expert testimony to support his contention that anything had gone wrong, that he had an active bile leak, or that he experienced postoperative pain that was "not normal."[5] Cooper's personal belief that something wrong had occurred and that his pain was not normal is insufficient to allow a jury to find in his favor. *See Flowers*, 105 F.4th at 945 ("Speculation cannot create a genuine issue of fact that defeats summary judgment." (citation omitted)).

Instead, the evidence suggests that, following the removal of the gallbladder, Dr. Reynolds inspected Cooper's abdomen. She confirmed that there was no bleeding or injury to any internal organs and that there was no evidence of a bile leak before suturing the surgical incision and concluding the procedure. Dr. Reynolds possessed no information at the time of Cooper's

[5] Citing Dr. Zafar's declaration in support of Dr. Zafar's motion for summary judgment, Cooper asserts that he does have expert testimony to support his proposition that a bile leak did occur during surgery. Yet, Dr. Zafar only declared that "[a] bile leak *may* occur if a bile duct is damaged or fails to seal during surgery." (ECF No. 217, ¶ 9 (emphasis added)). Dr. Zafar did not offer any opinion on when or how Cooper's bile leak originated or that it did occur during surgery.

discharge to suggest that the laparoscopic cholecystectomy procedure had not been completed entirely without complication that day, and Cooper did not have clinical signs consistent with a bile leak at the time of his discharge. In short, there is no evidence that reasonably suggests that Cooper experienced an active bile leak on September 26, 2023, or that Dr. Reynolds knew about it and failed to take reasonable measures to address it.

Cooper also argues that Dr. Reynolds ignored his complaints of postoperative pain. Dr. Reynolds asserts that Cooper was not conscious in the operating room after the surgery concluded and that she did not interact with him prior to his discharge. Cooper maintains that he was conscious in the operating room after the procedure and told Dr. Reynolds that he experienced severe pain. Even if Cooper told Dr. Reynolds he was in pain in the operating room, there is no evidence that Dr. Reynolds failed to take reasonable steps to treat Cooper's pain. Cooper does not dispute that postoperative pain is normal and expected. Dr. Reynolds issued orders for specified pain medications that could be administered by the nursing staff to Cooper in the event he reported any episodes of pain. Nursing staff administered pain medication to Cooper four times prior to his discharge. The nurses in the PACU and DOC units did not contact Dr. Reynolds with any report that Cooper complained of pain that was out of the ordinary or that the pain could not adequately be addressed through the administration of the ordered postoperative pain medication.

Cooper may disagree with Dr. Reynolds' decision to order pain medication to treat his postoperative pain and to not perform postoperative observation or assessment independent of that performed by the nursing staff, but he does not present any evidence to support a conclusion that "no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (citation omitted); *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot

evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."). On this record, no jury could reasonably conclude that Dr. Reynolds was deliberately indifferent to Cooper's postoperative pain. Accordingly, Dr. Reynolds is entitled to summary judgment on Cooper's Eighth Amendment claim against her.

**2. Dr. Kuffenkam**

Cooper asserts that Dr. Kuffenkam was deliberately indifferent because she unnecessarily delayed his treatment, did not return Cooper to the hospital, and ignored Dr. Reynolds' discharge instructions. He contends that Nurse Van Stippen told Dr. Kuffenkam over the telephone that Cooper was experiencing symptoms consistent with a bile leak, was experiencing extreme pain, was nauseous, had shortness of breath, was extremely jaundice, and had BBQ sauce–colored urine, but that, despite these symptoms, Dr. Kuffenkam refused to see him. Dr. Kuffenkam disputes Cooper's version of events and asserts that this telephone conversation never occurred. Yet, at this stage, the Court must accept Cooper's version of events as true. *See Cooper v. Dombeck*, No. 25-1686, 2026 WL 1412593, at *3 (7th Cir. May 20, 2026) ("We credit, as we must, Cooper's declaration recounting [the events] . . . ."). Cooper recounts what he asserts occurred in his declaration, and he has personal knowledge of his interactions with Nurse Van Stippen and his observations of Nurse Van Stippen discussing his symptoms with Dr. Kuffenkam on the telephone.

Even accepting that this telephone call occurred, after that conversation, Nurse Van Stippen approached Dr. Kuffenkam in Dr. Kuffenkam's office. Nurse Van Stippen told Dr. Kuffenkam that Cooper had undergone surgery to remove his gallbladder on September 26, 2023; that he was prescribed Tramadol 100 mg to take as needed four times a day for pain from September 26 to September 28 for a total of three days; that he was prescribed Docusate, a stool softener; and that

he was taking the maximum dose of his opioids but was refusing to take Docusate, his constipation medication. After this conversation, Dr. Kuffenkam reviewed Cooper's medical record. She noted that Nurse Van Stippen indicated in a nursing note that Cooper had not had a bowel movement, was not able to pass gas, and had a decreased appetite. Dr. Kuffenkam observed that Cooper was prescribed Tramadol, an opioid, for pain as well as Docusate, a stool softener intended to prevent constipation. Even though Cooper was taking the maximum dose of Tramadol, he refused to take the Docusate.

Dr. Kuffenkam believed that the pain or discomfort Cooper experienced was caused by his abdominal bloating and constipation, common side effects of Tramadol. She prescribed Cooper three different medications: Maalox, an oral medication for constipation; Docusate-Senna tablets for constipation; and Simethicone tablets to help with the bloating. Dr. Kuffenkam ordered that the Docusate tablets be staff controlled to confirm that Cooper was getting the medicine from correctional officers and that he was taking the medicine. She also placed an order for Cooper to follow up with nursing staff to repeat his vitals and physical exam in 48 hours. The September 28, 2023, orders for anti-constipation and anti-gas medication were Dr. Kuffenkam's only interaction with Cooper's post-surgical medical issue.

Cooper asserts that Dr. Kuffenkam should have done more than order the stool softener and that she should have performed her own independent assessment of him beyond that performed by Nurse Van Stippen. While Dr. Kuffenkam may have been negligent in deferring to Nurse Van Stippen's report and relying on the medical records in determining how to treat Cooper's symptoms, there is no evidence of deliberate indifference. There was no reason for Dr. Kuffenkam to mistrust what Nurse Van Stippen reported to her in her office or to not rely on the medical records in reaching her own conclusions about the proper course of treatment. Cooper has not

presented any evidence showing that Dr. Kuffenkam's treatment decisions were so below the range of acceptable care that "no minimally competent professional would have so responded under those circumstances." *Sain*, 512 F.3d at 895 (citation omitted). Indeed, mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient to support an Eighth Amendment claim. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Cooper also asserts that Dr. Kuffenkam failed to follow Dr. Reynolds' discharge instructions, which stated that Cooper should be returned to the hospital if Cooper had a temperature higher than 101.5 Fahrenheit; he is unable to urinate for six to eight hours after surgery or he becomes uncomfortable; his pain gets worse or does not get better after taking his prescribed pain medications as directed; he has nausea, vomiting, or loss of appetite; there is bleeding from Cooper's incision or IV site; or his incision or IV site looks infected. "But prison medical staff are not required to follow the recommendations of specialists if they are aware of the recommendations and choose a different course of action based on their own medical judgments." *Cooper*, 2026 WL 1412593, at *3 (citing *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018)).

Given Dr. Kuffenkam's limited involvement and her efforts to provide Cooper with relief, no jury could reasonably conclude that she was deliberately indifferent to Cooper's serious medical needs. She is therefore entitled to summary judgment. Dr. Kuffenkam argues that she is entitled to qualified immunity, but because the Court is granting summary judgment in her favor on the merits, it need not address that argument.

**3. Nurse Wenger**

Cooper contends that Nurse Wenger was deliberately indifferent because she unnecessarily delayed his treatment, never contacted a provider to provide medical treatment, did not return Cooper to the hospital, and ignored Dr. Reynolds' discharge instructions. "Nurses, like physicians,

may . . . be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted).

According to Cooper, as early as his first encounter with Nurse Wenger on September 29, 2023, he walked with a slow, slumped gait while guarding his stomach and told Nurse Wenger that he had not been able to eat, was nauseated and vomiting, had been in extreme pain for days, and urinated black urine. Nurse Wenger acknowledged that Cooper's urine was "tar black," but she said she would not contact a doctor because she thought Cooper was faking and did not care if Cooper died. He contends that Nurse Wenger refused to provide treatment or refer him to a provider the three times she saw him. Nurse Wenger disputes Cooper's version of events and asserts that it is unsupported by the medical record. Cooper recounts the events in his declaration and has personal knowledge of his symptoms as well as his interactions with Nurse Wenger. Again, accepting Cooper's version of events as true, as the Court must, there is sufficient evidence from which a jury could reasonably conclude that Nurse Wenger was deliberately indifferent to Cooper's serious medical needs. *See Cooper*, 2026 WL 1412593, at *3.

Alternatively, Nurse Wenger argues that, even if the Court determines there is evidence from which a jury could conclude that she violated Cooper's Eighth Amendment rights, she is shielded from personal liability under the doctrine of qualified immunity. Qualified immunity protects government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome the defense of qualified immunity, the plaintiff "must first allege the deprivation of an actual constitutional right, and second, show that the right was clearly established at the time of the alleged violation." *Id.*

The general standard for "denying or delaying access to medical care" is clearly established by Supreme Court precedent. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). However, in light of the factual disputes that exist regarding Nurse Wenger's alleged unlawful conduct, the Court will await further development of the record at trial before determining whether Nurse Wenger violated clearly established law. Accordingly, Nurse Wenger's motion for summary judgment under the Eighth Amendment and qualified immunity grounds must be denied.

**4. Dr. Zafar**

Cooper argues that Dr. Zafar was deliberately indifferent to his medical needs when he prematurely removed Cooper's IR drain and discharged Cooper from the hospital, even though Cooper was discharging fluids. He asserts that Dr. Zafar stated he was removing Cooper's IR drain because he did not want to deal with Cooper's medical condition and that he needed to discharge Cooper as soon as possible because Cooper's procedures were causing the State of Wisconsin and taxpayers too much money. Even crediting Cooper's version of events, Dr. Zafar's statements do not provide evidence of deliberate indifference.

Cooper argues that Dr. Zafar prematurely removed his IR drain, but Cooper does not present sufficient evidence from which a jury could find that Dr. Zafar's decision to remove the IR drain fell so far short of professional standards to constitute deliberate indifference. Dr. Zafar explains that an IR drain should be removed as soon as it fulfills its purpose and that leaving a drain unnecessarily can lead to more issues, such as abscess or infection. In this case, it was determined that Cooper's IR drain was no longer necessary because he produced minimal bile output. After consulting gastroenterology and radiology, Dr. Zafar ordered that Cooper's IR drain be removed. Cooper maintains that the removal of the IR drain on October 27, 2023, caused increased fluid collection and an abscess to grow on his liver, resulting in a second surgery to place

a new IR drain. Cooper, however, has not produced any expert testimony to establish causation. *See McGown v. Arnold*, No. 13-cv-148, 2014 WL 5502612, at *6 (N.D. Ind. Oct. 30, 2014) ("Matters of causation generally necessitate expert testimony." (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863–64 (7th Cir. 2010); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010))).

Cooper also asserts that Dr. Zafar discharged him from the hospital knowing that he had a high persistent bile leak. Even though Dr. Zafar acknowledged that Cooper arrived at UW Health University Hospital with a high persistent bile leak on October 23, 2023, Cooper has presented no evidence that he suffered a high persistent bile leak at the time he was discharged. Instead, the evidence in the record establishes that Cooper's drainage was considered "minimal output" and that the minimal fluid collection in the gallbladder fossa was not clinically significant. Again, while Cooper disputes that his drainage output and fluid collection were minimal, he presents no evidence or expert testimony to support his assertion. *See Flowers*, 105 F.4th at 945.

Cooper may disagree with Dr. Zafar's treatment and discharge decisions, but he has not demonstrated that Dr. Zafar's actions were "a substantial departure from accepted professional judgment, practice, or standards." *Wilson*, 901 F.3d at 822 (quoting *Sain*, 512 F.3d at 895). Cooper has failed to establish that Dr. Zafar was deliberately indifferent to his medical needs. Accordingly, Dr. Zafar is entitled to summary judgment on Cooper's Eighth Amendment claim.

**5. Nurse Bauersfeld**

Cooper contends that Nurse Bauersfeld was deliberately indifferent when she forcefully flushed his IR drain on December 26, 2023, even though she knew that the doctor had discontinued the daily flushing order and that flushing the drain would cause him pain. Although Nurse Bauersfeld asserts that she did not know about the discontinuation order because she was not

included on the nursing communications concerning the order, Cooper asserts that he told her that Dr. English discontinued the order on December 7, 2023, and asked her to review his medical chart to confirm that the flushing order had stopped. According to Cooper, he begged Nurse Bauersfeld not to flush the drain because it caused extreme, unrelenting pain, but Nurse Bauersfeld pushed the entire tube of saline into the drain. He asserts that he began screaming in pain and dropped to the floor, but Nurse Bauersfeld refused to treat him and ordered that he be forcibly removed from the exam room. When viewing the facts in the light most favorable to Cooper, a reasonable jury could conclude that Nurse Bauersfeld was deliberately indifferent to Cooper's serious medical needs. In short, Nurse Bauersfeld's motion for summary judgment on Cooper's Eighth Amendment claim must be denied.

**C. State Law Claims**

Nurse Wenger argues that Cooper's state law negligence claim against her is barred by Wisconsin's notice-of-claim statute. The notice-of-claim statute generally requires that a claimant bringing a civil action against a state employee serve written notice of the claim on Wisconsin's Attorney General within 120 days of the event allegedly giving rise to the injury. *See* Wis. Stat. § 893.82(3). Although the notice requirements under Wis. Stat. § 893.82 do not apply to medical malpractice claims, *see* Wis. Stat. § 893.82(5m), nurses are not subject to state law malpractice claims. *See Tallman v. Gugler*, No. 19-CV-1920-JPS, 2021 WL 842135, at *1–2 (E.D. Wis. Mar. 5, 2021). Cooper is proceeding on a state law negligence claim against Nurse Wenger, which *does* require compliance with Wisconsin's notice of claim statute. *See id.*; *see also Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).

Nurse Wenger maintains that there is no evidence that Cooper served any notices of claim upon the Wisconsin Attorney General regarding the present action. Even though Cooper asserts

that he filed a notice of claim, he neither declares under penalty of perjury that he filed a notice of claim nor states when he served the notice of claim or what information the notice of claim contained. Cooper presents no evidence that the Attorney General's office received a notice of claim related to Nurse Wenger that complied with the requirements of Wis. Stat. § 893.82. Therefore, the Court will dismiss Cooper's medical negligence claim against Nurse Wenger based on Cooper's failure to file a notice of claim in accordance with Wis. Stat. § 893.82(3).

Cooper also asserts a medical negligence claim against Nurse Bauersfeld. To prove negligence, the plaintiff must show "(1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of that injury." *Rockweit by Donahue v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995) (citation omitted). In medical negligence cases, "the plaintiff must establish the standard of care, show that the defendant failed to conform to the standard of care, and prove that the defendant's failure to conform to the standard of care caused the plaintiff's injury." *Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524 (citation omitted).

Nurse Bauersfeld argues that Cooper's state law negligence claim against her must be dismissed because he failed to produce an expert opinion on the standard of care, breach, or causation. "In the medical malpractice setting, Wisconsin requires expert testimony to establish medical negligence except in situations where the errors were of such a nature that a layperson could conclude from common experience that such mistakes do not happen if the physician had experienced proper skill and care." *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004) (citations omitted). In other words, no expert testimony is needed where "the situation is one where the common knowledge of laymen affords a basis for finding negligence." *Wilson v. Adams*, 901 F.3d

816, 823 (7th Cir. 2018) (quoting *Christianson v. Downs*, 90 Wis. 2d 332, 279 N.W.2d 918, 921 (1979)).

Construing the facts in Cooper's favor, Nurse Bauersfeld made a deliberate choice to flush his IR drain with ten cubic centimeters of saline, even though he told her that the flush order had been discontinued and caused him severe pain. After she flushed the drain, Cooper showed signs of extreme pain, but Nurse Bauersfeld refused to treat him and ordered him returned to his cell. Without expert medical testimony, a layperson can appreciate or understand that refusing to make any effort to address significant pain does not meet the standard of care. Accordingly, summary judgment on Cooper's state law negligence claim against Nurse Bauersfeld is not warranted.

Cooper also asserts state law claims against Dr. Reynolds, Dr. Kuffenkam, and Dr. Zafar. Because the proof necessary for Cooper's state law claims against Dr. Reynolds, Dr. Kuffenkam, and Dr. Zafar will not overlap with the proof necessary for his claims against the remaining defendants, the Court will relinquish supplemental jurisdiction over the state law claims against Dr. Reynolds, Dr. Kuffenkam, and Dr. Zafar. *See Hernandez v. Dart*, 635 F. Supp. 2d 798, 814 (N.D. Ill. 2009) (explaining that supplemental jurisdiction is not appropriate merely because the claims are "tangentially related" or share a broad factual background); *Birdo v. Mathis*, No. 15-cv-456, 2015 WL 3948150, at *3 (S.D. Ill. June 26, 2015) (noting that "the question is whether the proof necessary for the state claim overlaps with the proof necessary for the federal claim"); *see also* 28 U.S.C. § 1367(c)(3) (a district court may relinquish its jurisdiction over state law claims after the federal claims are resolved). Cooper may pursue state law claims against Dr. Reynolds, Dr. Kuffenkam, and Dr. Zafar in state court, if he so chooses.

### D. Motion for Rule 11 Sanctions

Cooper has filed a motion for Rule 11 sanctions against Nurse Wenger. "The purpose of Federal Rule of Civil Procedure 11 sanctions is to deter baseless filings in the district court." *Eberhardt v. Walsh*, 122 F.4th 681, 686 (7th Cir. 2024) (citation omitted). Rule 11 imposes the duty on attorneys and *pro se* parties to "make 'an inquiry reasonable under the circumstances' and then submit only 'claims' and 'legal contentions' that 'are warranted by existing law.'" *Id.* (citing Fed. R. Civ. P. 11(b)(2)).

Cooper asserts that Nurse Wenger falsely argued in her motion for summary judgment that Cooper did not submit a notice of claim and that her notice-of-claim arguments were frivolous. Yet, Nurse Wenger's arguments regarding Cooper's obligation to file a notice of claim against her and his failure to do so were not frivolous or meritless. As explained above, the Court accepted Nurse Wenger's arguments in granting her motion for summary judgment with respect to Cooper's state law claim against her. Cooper has not identified any action by Nurse Wenger that warrants sanctions. Therefore, Cooper's motion for Rule 11 sanctions is denied.

## NEXT STEPS

Cooper's Eighth Amendment deliberate indifference claims against Nurse Wenger and Nurse Bauersfeld as well as his state law negligence claims against Nurse Bauersfeld and Amergis will proceed to trial. On May 18, 2026, Cooper filed a motion to appoint counsel. Given the complexity of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court concludes that Cooper will benefit from the assistance of counsel in the next stage of litigation. Accordingly, Cooper's motion to appoint counsel is granted, and the Court will make efforts to recruit a volunteer lawyer to represent him at trial.

The demand for volunteer lawyers is high, but the supply is low. Few lawyers have the time, ability, or experience to volunteer for cases such as these. The Court encourages Cooper to be patient as it makes efforts to recruit a lawyer to represent him. The process may take some time. The Court will promptly notify Cooper in the event a lawyer volunteers. In the meantime, the Court encourages the parties to explore settlement. If the parties would like to try mediation, the Court can refer the case to a magistrate judge for that purpose. If at any time Cooper decides he would like to proceed on his own without a lawyer, he should promptly notify the Court, and the Court will schedule a status conference to set a trial date.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Dr. Reynolds and Waupun Memorial Hospital's motion for summary judgment (ECF No. 231) is **GRANTED** and Cooper's motion for partial summary judgment (ECF No. 188) is **DENIED**. Cooper's federal law claims against Dr. Reynolds and Waupun Memorial Hospital are dismissed. Cooper's state law claim against Dr. Reynolds is dismissed without prejudice. Dr. Reynold and Waupun Memorial Hospital are terminated as defendants in this action.

**IT IS FURTHER ORDERED** that Dr. Kuffenkam and Nurse Wenger's motion for summary judgment (ECF No. 218) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted with respect to Cooper's federal law claim against Dr. Kuffenkam and Cooper's state law negligence claim against Nurse Wenger and those claims are dismissed. The motion is denied with respect to Cooper's Eighth Amendment claim against Nurse Wenger. Cooper's state law claim against Dr. Kuffenkam is dismissed without prejudice. Dr. Kuffenkam is terminated as a defendant in this action.

**IT IS FURTHER ORDERED** that Dr. Zafar's motion for summary judgment (ECF No. 214) is **GRANTED**. Cooper's federal law claim against Dr. Zafar is dismissed. Cooper's state law claim against Dr. Zafar is dismissed without prejudice. Dr. Zafar is terminated as a defendant in this action.

**IT IS FURTHER ORDERED** that Nurse Bauersfeld's motion for summary judgment (ECF No. 226) is **DENIED**.

**IT IS FURTHER ORDERED** that Cooper's motions for leave to file a sur-reply (ECF No. 282 & 283) are **GRANTED**.

**IT IS FURTHER ORDERED** that Cooper's motions to strike (ECF Nos. 260 & 281) are **DENIED**.

**IT IS FURTHER ORDERED** that Cooper's motion to appoint counsel (ECF No. 261) is **GRANTED**.

**IT IS FURTHER ORDERED** that Cooper's motion for sanctions (ECF No. 285) is **DENIED**.

Dated at Green Bay, Wisconsin on September 1, 2026.

s/ *Byron B. Conway*
BYRON B. CONWAY
United States District Judge